UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:13-CV-695

CRAIG PERKINS                                                                              Plaintiff

v.

LARRY BENNETT, *et al.*                                                          Defendants


**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Defendants Larry Bennett, Dwight Bennett, and Advance Mortgage Source, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction. (Docket No. 5.) Plaintiff Craig Perkins has responded, (Docket No. 6), and Defendants have replied, (Docket No. 7). This matter is now ripe adjudication. For the reasons that follow, Defendants' Motion will be GRANTED.


BACKGROUND

Plaintiff Craig Perkins (Perkins) filed his original complaint in Jefferson Circuit Court on June 12, 2013, against Defendants Larry Bennett; Dwight Bennett; Advance Mortgage Source, Inc., d/b/a South Carolina Mortgage Associates (SCMA); William Marango (Marango); and Mojave Property Management, LLC (Mojave). (Docket No. 1-1.) Defendants [1] removed this action on July 9, 2013, on the basis of diversity jurisdiction. (Docket No. 1.) Much of the facts pertinent to Defendants' instant Motion

---

[1] For purposes of this Opinion, "Defendants" will refer collectively to Larry Bennett, Dwight Bennett, and SCMA.

do not appear disputed.  Regardless, for purposes of this Opinion, the Court will presume that all of the factual allegations in Perkins' Complaint are true.

Perkins is a Kentucky resident, Larry Bennett and Dwight Bennett are South Carolina residents, and SCMA is a South Carolina corporation.  Larry Bennett worked in SCMA's Beaufort, South Carolina, office as a loan officer.  Dwight Bennett was the President of SCMA between 1999 and 2012, and worked in the company's offices in Spartanburg and Hilton Head, South Carolina. Marango is a California resident, and Mojave is a Nevada limited liability company.  Marango and Mojave have not entered an appearance or otherwise responded to this litigation.

Perkins was contacted via telephone in early July 2010 by Larry Bennett, who stated that SCMA was seeking investors for an "ultra safe" investment in a ski resort. Perkins was again contacted by Larry Bennett in late July 2010 and advised that the investment would involve loaning $150,000 to Marango and Mojave, who would then use those funds to secure financing as a down payment to purchase the Wolf Ridge Ski Resort in Mars Hill, North Carolina.  In return, Perkins would receive a return on his investment after the closing on the ski resort.  In a separate phone call, Larry Bennett advised Perkins that Marango and Mojave would secure the investment through an interest in an apartment complex Mojave owned in Limestone, Aroostook County, Maine, which would be used as collateral.  Perkins inquired as to the value of the apartment complex collateral, and Larry Bennett represented that the complex was listed for sale for over $1,200,000, was worth more than $1,000,000, and was encumbered by one mortgage in the amount of $150,000.  Perkins avers that at this point, he had only dealt with Larry Bennett and had not spoken to either Marango or Mojave.

On July 29, 2010, Perkins received an email from Larry Bennett containing the listing for the apartment complex and stating, "We will have the paperwork over to you in the morning." Perkins responded via email the following day and requested copies of the proposed loan agreement and the title search for the apartment complex. Larry Bennett replied via email, advising Perkins that they were still waiting on the title search. On August 4, 2010, Larry Bennett emailed Perkins the Mortgage Note and Mortgage Deed for the apartment complex, as well as wiring instructions for Perkins to wire the $150,000 to a bank in South Carolina. Pursuant to the Mortgage Note, which was executed by Marango on behalf of Mojave, Mojave agreed to pay Perkins $150,000 plus $40,000 in interest from the proceeds of the sale of the ski resort. (Docket No. 1-1, at 22-23.) Larry Bennett informed Perkins via telephone that after the funds were transferred and the Mortgage Note was executed, he would personally file the Mortgage Note and Mortgage Deed in the state and county where the apartment complex was located. Perkins then wired the $150,000 as instructed.

On August 9 and August 13, 2010, Perkins emailed Larry Bennett asking if a closing date for the ski resort had been established, but Perkins did not receive a response. On September 24, 2010, Perkins was copied on an email from Larry Bennett to Marango in which Larry Bennett provided Marango with Perkins' address in Louisville, Kentucky, stating "below is the address to send the money to." Perkins emailed Larry Bennett on September 28, 2010, inquiring as to the status of the monthly payments under the Mortgage Note. On September 30, 2010, Larry Bennett emailed Perkins the Federal Express tracking number for payment under the Mortgage Note. On October 4, 2010, Perkins received a $500 check from Marango, individually, for late fees under the

Mortgage Note. When Perkins attempted to negotiate the check, it was returned for insufficient funds (NSF). Perkins then contacted Larry Bennett to advise him of the NSF check and to request a copy of the recorded deed. Larry Bennett emailed Perkins on October 4, 2010, stating that he would speak to Marango and would send Perkins a copy of the Mortgage Note and Mortgage Deed. Perkins emailed Larry Bennett again on October 13, 2010, to request an update on the status of the recorded Mortgage Note and Mortgage Deed. Larry Bennett responded, stating that his attorney had not filed the Mortgage Note and Mortgage Deed and that he, Larry Bennett, would personally record the deed. Perkins again contacted Larry Bennett on October 19, 2010, regarding the status of the recorded Mortgage Note and Mortgage Deed, but received no response. Perkins then contacted the registry of deeds in Aroostook County, Maine, and was informed that no Mortgage Note or Mortgage Deed had been recorded. That same day, October 19, Perkins sent a copy of the Mortgage Note and Mortgage Deed via overnight service to the registry in Aroostook County, Maine. The Mortgage Note and Mortgage Deed were recorded the following day on October 20, 2010.

Between October 2010 and May 2011, Perkins and Larry Bennett exchanged approximately ten emails and, according to Perkins, "hundreds of telephone calls" in which Larry Bennett promised Perkins that the closing of the ski resort would occur in the near future and assured Perkins that his investment was secure. In June 2011, Perkins contacted Dwight Bennett, President of SCMA, regarding the events surrounding the loan and Perkins' dealings with Larry Bennett. On June 28, 2011, Dwight Bennett, on behalf of SCMA, sent a letter signed by himself and Larry Bennett to Perkins, advising Perkins that the closing on the ski resort was "imminent." Dwight Bennett also advised Perkins

that he, Larry Bennett, and another SCMA employee would receive $180,000 in commission upon the closing. Dwight Bennett offered Perkins half of that commission ($90,000) in exchange for not filing a lawsuit against Defendants. Perkins refused that offer, and he and Dwight Bennett continued to negotiate the terms of settlement via email and telephone over the next several days. Ultimately, no agreement was reached. Then in November 2011, Dwight Bennett contacted Perkins to inquire whether Perkins wanted to invest up to $1,500,000 in the ski resort in exchange for a "relatively fast bonus" of $500,000 plus 10% of Dwight Bennett's company. Perkins refused that offer.

According to Perkins, between July 2010 and November 2011, he exchanged a total of approximately 40 emails and over 300 phone calls with Larry Bennett and Dwight Bennett. During that time, Perkins states that he spoke to Marango on only two occasions, both of which were after Marango had tendered an NSF check to Perkins.

Defendants now move to dismiss Perkins' Complaint for lack of personal jurisdiction over them. In support of their Motion, Larry Bennett and Dwight Bennett each have submitted signed Declarations.[2] In his Declaration, Larry Bennett states: (1) that he has never traveled to or spent time in Kentucky, and has only entered Kentucky on occasions where he had connecting flights through the Cincinnati/Northern Kentucky International Airport; (2) that neither he nor SCMA has conducted any business in Kentucky at any time; (3) that SCMA did not maintain offices in or have employees or agents in Kentucky; (4) that SCMA did not solicit business or advertise in Kentucky; (5) that SCMA conducted business solely in South Carolina, Georgia, and North Carolina,

---

[2] Under 28 U.S.C. § 1746, an unsworn declaration has the same effect as a sworn declaration if it is dated and signed by the declarant as true under penalty of perjury. Both Larry Bennett and Dwight Bennett's declarations appear to satisfy these requirements.

and did not seek to conduct business outside those states; (6) that neither he nor SCMA has ever owned real property in Kentucky; (7) that he never transacted business in Kentucky either prior to, during, or after his employment with SCMA; (8) that his only in-person meeting with Perkins occurred in South Carolina in early 2012; and (9) that he was located in South Carolina at all times when he communicated with Perkins. (Docket No. 5-2.) Dwight Bennett, in his Declaration, states: (1) that he has never traveled to or spent any time in Kentucky; (2) that neither he nor SCMA have every conducted any business in Kentucky; (3) that SCMA did not maintain offices in or have employees or agents in Kentucky; (4) that SCMA did not solicit business or advertise in Kentucky; (5) that SCMA conducted business solely in South Carolina, Georgia, and North Carolina, and did not seek to conduct business outside those states; (6) that neither he nor SCMA has ever owned real property in Kentucky; (7) that he never transacted business in Kentucky either prior to, during, or after his employment with SCMA; (8) that he has never met Perkins in person; (9) that he was unaware of the Mortgage Note and Mortgage Deed and related events until approximately June 2011; and (10) that he was located in South Carolina at all times when he communicated with Perkins via email or telephone. (Docket No. 5-3.)


STANDARD

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(2), the plaintiff , as the party asserting personal jurisdiction, bears the burden of establishing that such jurisdiction exists. *E.g.*, *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007). When a district court resolves a motion to dismiss for lack of personal jurisdiction by relying on written submissions and affidavits rather than holding

an evidentiary hearing, the plaintiff is only required to make a prima facie showing that personal jurisdiction exists to defeat the motion. *Id.*; *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). To meet that burden, the plaintiff must "establish[] with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction." *Neogen*, 282 F.3d at 887 (quoting *Provident Nat'l Bank v. Cal. Fed. Savings Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)). Without a hearing, the court must construe the pleadings and affidavits in the light most favorable to the plaintiff, *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996), and cannot "consider facts proffered by the defendant that conflict with those offered by the plaintiff," *Neogen,* 282 F.3d at 887. However, a plaintiff may not rely on his pleadings to answer the movant's affidavits, "but must set forth, by affidavit or otherwise . . . specific facts showing that the court has jurisdiction." *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989) (citing *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929 (6th Cir. 1974)).

## DISCUSSION

The Sixth Circuit recognizes that personal jurisdiction may be either "specific" or "general," depending on the nature of the defendant's contacts with the forum state. *E.g.*, *Gerber v. Riordan*, 649 F.3d 514, 517 (6th Cir. 2011). In his Complaint, Perkins asserts that "[j]urisdiction is proper pursuant to Section 112 of the Constitution of the Commonwealth of Kentucky and Kentucky Revised Statute 454.210." (Docket No. 1-1, at 6.) Thus, it appears that Perkins is asserting that the Court has both general and specific jurisdiction over Defendants.

# I.     General Jurisdiction

"General jurisdiction is proper only where a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state." *Gerber*, 649 F.3d at 517 (quoting *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000)).  The Supreme Court has held that a nonresident defendant who lacked a place of business and had never been licenses to do business in the forum state lacked sufficient contacts to support the exercise of general jurisdiction.  *See Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 416-18 (1984).  In *Helicopteros*, the Court found that a number of contacts, including (1) sending a corporate officer to the forum to negotiate contracts, (2) accepting checks written on a forum bank, (3) purchasing a substantial sum of equipment and services from a forum state business, and (4) sending personnel to a forum state business for training—even when taken together—were insufficient to support the exercise of general jurisdiction. *Id.*  By contract, the Court has found general jurisdiction where a nonresident corporate officer maintained an office and held meetings in the forum state, supervised corporate business while situated in the forum state, distributed payroll checks drawn on a forum bank account, and engaged a forum bank in the corporation's business.  *See Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 448 (1952).  The Sixth Circuit follows this reasoning by declining to find general jurisdiction where a plaintiff "has not alleged that [the defendant] has an office in [the forum state], is licensed to do business there, has [a forum state] bank account, or directs its business operations from [the forum state]." *Bird v. Parsons*, 289 F.3d 865 873 (6th Cir. 2002).

In the instant case, Perkins does not allege that Defendants maintain an office in Kentucky, are licensed to do business in Kentucky, maintain a bank account in Kentucky, or direct their operations from within Kentucky. Dwight Bennett has never been to Kentucky, and Larry Bennett has only visited Kentucky incidentally. Indeed, it appears that Defendants have had no contacts with Kentucky beyond their communications with Perkins. Accordingly, Perkins has not demonstrated that Defendants' contacts with Kentucky are sufficiently continuous and systematic as to support the exercise of general personal jurisdiction.

## II.     Specific Jurisdiction

In order to determine whether specific personal jurisdiction exists, a federal court applies the law of the forum in which it sits, subject to the requirements of constitutional due process. *Kerry Steel, Inc. v. Paragon Indus., Inc.,* 106 F.3d 147, 149 (6th Cir. 1997). That is, "[a] federal court's exercise of personal jurisdiction in a diversity of citizenship case must be both (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Bird*, 289 F.3d at 888 (citing *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir.1994)).

### A.     The Kentucky Long-Arm Statute

Although courts previously had held that Kentucky's long-arm statute, Ky. Rev. Stat. § 454.210, extends to the outer reaches of due process, *see, e.g.*, *Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 730 F. Supp. 2d 683, 689 (W.D. Ky. 2010), the Kentucky Supreme Court recently clarified that the statute is not coextensive with the limits of federal due process. *Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51,

56 (Ky. 2011). Instead, the Kentucky Supreme Court has held that "the proper analysis of long-arm jurisdiction over a nonresident defendant consists of a two-step process." *Id.* at 57. First, a court must determine whether the defendant's conduct and activities fall within one of the nine specific provisions in § 454.210(2)(a). "If not, then *in personam* jurisdiction may not be exercised." *Id.* Second, and only if jurisdiction is permissible under the long-arm statute, the court must determine whether jurisdiction comports with federal due process requirements. *Id.* Thus, this Court first turns to the question of whether it can exercise personal jurisdiction over Defendants under the Kentucky long-arm statute; only if so will the Court proceed to the constitutional inquiry.

Perkins' Complaint does not identify which of the nine provisions in the Kentucky long-arm statute he relies upon for personal jurisdiction. However, by way of his Response to Defendants' instant Motion, Perkins makes clear that he relies on the following three provisions in § 454.210(2)(a):

> A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's:
>
> 1. Transacting any business in this Commonwealth;
> . . . .
>
> 3. Causing tortious injury by an act or omission in this Commonwealth;
> . . . .
>
> 9. Making a telephone solicitation, as defined in KRS 367.46951, into the Commonwealth.

In interpreting § 454.210(2)(a), the Kentucky Supreme Court instructs: "While we believe it fair to say that these provisions should be liberally construed in favor of long-

arm jurisdiction, their limits upon jurisdiction must be observed as defined." *Caesars*

*Riverboat Casino*, 336 S.W.3d at 56.

### 1. "Transacting any business in this Commonwealth"

Perkins argues that Defendants transacted business in Kentucky by contacting him

for the purpose of soliciting funds from him.  As mortgage brokers who "act as a conduit

between the buyer and the lender," Perkins reasons that Defendants transacted business

by facilitating the loan of $150,000 from Perkins, as the lender, to Marango and Mojave,

as the buyers.  (Docket No. 6-1, at 10-11.)  Defendants maintain that they have never

transacted any business in Kentucky.  Defendants point out that neither Larry Bennett,

Dwight Bennett, nor SCMA was a party to the Mortgage Note between Perkins and

Marango/Mojave.  Defendants further insist that their only connection with Kentucky is

the fact that Perkins was in Kentucky at the time of the events underlying his Complaint.

As the Kentucky Supreme Court only recently stated that the long-arm statute

must be analyzed separately from due process, there is little precedent interpreting the

precise meaning of the phrase "transacting business" as used in § 454.210(2)(a)(1).

Based on the limited authority that does exist, the Court concludes that Defendants did

not transact business in Kentucky within the meaning of § 454.210(2)(a)(1).  Aside from

contacting Perkins to facilitate a loan from Perkins to Marango and Mojave, Defendants

had no other dealings with either Perkins or Kentucky.  The only contractual relationship

alleged in Perkins' Complaint is between Perkins and Marango/Mojave.  The facts that

Perkins wired funds to a South Carolina bank, that Larry Bennett may have provided

Perkins the relevant account information to do so does, and that Perkins suffered injury in

Kentucky do not amount to "transacting business" in Kentucky, as that term has been

interpreted by courts applying the Kentucky long-arm statute. *See Mueller v. Heath*, 2013 WL 4511898, at *3 (W.D. Ky. Aug. 23, 2013) (finding, in a case alleging fraudulent inducement to invest in a security alarm company, that the defendants had not transacted business in Kentucky despite that the plaintiffs "may have wired funds from Kentucky [to an out-of-state entity] and suffered injury in Kentucky"); *Thompson v. Koko*, 2012 WL 374054, at *1-2 (W.D. Ky. Feb. 3, 2012) (finding that out-of-state defendant's actions of sending emails and letters, confirming receipt of a wire transfer, and sending account statements to the plaintiff in Kentucky did not amount to transacting business in Kentucky); *Ford v. RDI/Caesars Riverboat Casino, LLC*, 503 F. Supp. 2d 839, 841-43 (W.D. Ky. 2007) (finding that the defendant transacted business in Kentucky where roughly half of its customers were from Kentucky, it derived substantial revenue (in excess of $109 million) from Kentucky residents, it advertised extensively in Kentucky, and it actively sponsored events in Kentucky and made considerable contributions to Kentucky charities); *Am. Trade Alliance, Inc. v. S. Cross Trading*, 2011 WL 112439, at *2 (Ky. Ct. App. Jan. 14, 2011) (finding that the defendant transacted business in Kentucky where it contracted to do business in Kentucky, accepted orders from and shipped goods to a Kentucky buyer, and actively promoted the sale of its products to Kentucky residents). Perkins' reliance on nonbinding case law applying other states' long-arm statutes is unavailing. Accordingly, the Court finds that the Defendants' conduct does not fall within this enumerated subparagraph of § 454.210(2)(a).

### 2. "Causing tortious injury by an act or omission in this Commonwealth"

The Court also cannot conclude that it has personal jurisdiction over Defendants pursuant to Ky. Rev. Stat. § 454.210(a)(2)(3). It is undisputed that Defendants were, at

all relevant times, located in South Carolina. Perkins seems to argue that because the alleged tortious acts of fraud and misrepresentation were committed via telephone and email, the causal act was complete "[e]very time [he] picked up the telephone to answer Defendants' calls . . . and every time [he] opened up his email inbox." (Docket No. 6-1, at 15.) In support of his position, Perkins cites the Kentucky Court of Appeals' decision in *Pierce v. Serafin*, 787 S.W.2d 705, 706 (Ky. Ct. App. 1990); however, Perkins' argument is precisely the argument rejected by the court in that case. There, the court of appeals compared the language of subparagraph (3) with the following subparagraph, which states: "Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed in this Commonwealth . . . ." Ky. Rev. Stat. § 454.210(2)(a)(4). Comparing subparagraphs (3) and (4), the court explained:

> In both subparagraph three (3) and subparagraph four (4) the tortious injury occurs within the Commonwealth, but in paragraph three (3) the causal act also occurs within the state while in paragraph four (4) it occurs outside the state. If the court were to hold that a plaintiff could use paragraph three (3) to obtain jurisdiction the necessity for paragraph four (4) would be completely obviated as every set of facts which gave rise to tortious injury could be brought within the terms of paragraph three (3). Thus Kentucky has elected to assume personal jurisdiction over a nonresident tort-feasor whose activities outside the state result in injury in this state only if that tort-feasor regularly does or solicits business within the state or has other substantial connection to the Commonwealth.

*Pierce*, 787 S.W.2d at 706-07. Because Defendants' allegedly wrongful acts were not committed within Kentucky, the Court cannot exercise personal jurisdiction over Defendants pursuant to § 454.210(2)(a)(3).

### 3. "Making a telephone solicitation . . . into the Commonwealth"

For purposes of Ky. Rev. Stat. § 454.210(2)(a)(9), "telephone solicitation" is defined, in relevant part, as "[a] communication sent by a telephone . . . to a residential, mobile, or telephone paging device telephone number . . . for the purpose of . . . offering an investment, business, or employment opportunity." Ky. Rev. Stat. § 367.46951(1)(a)(1). Perkins claims that Larry Bennett initially contacted him via telephone in July 2010 to offer the investment/business opportunity of loaning $150,000 to Marango and Mojave. Defendants argue that subparagraph (9) is inapplicable because they did not offer Perkins an "investment" or "business opportunity," insisting that Perkins "repeated attempts to characterize his loan to Marango as an investment do not make it so." (Docket No. 7, at 7.) According to Perkins, Larry Bennett offered him the opportunity to loan money to another party and represented that he would earn a profit from the interest on that loan. Thus, while Larry Bennett may not have telephoned Perkins for the purpose of offering an investment, *per se*, it appears to the Court that Larry Bennett was offering Perkins a business opportunity.

In keeping with the Kentucky Supreme Court's instruction that the provisions of § 454.210(2)(a) "should be liberally construed in favor of long-arm jurisdiction," the Court is satisfied that Perkins has made a prima facie showing that personal jurisdiction exists over Larry Bennett under subparagraph (9). Furthermore, Defendants do not appear to dispute that Larry Bennett was acting on behalf of SCMA when he initially

contacted Perkins in July 2010. As such, this Court also has personal jurisdiction over SCMA. *See* Ky. Rev. Stat. § 454.210(1), (2)(a).

However, the Court cannot similarly conclude that subparagraph (9) confers personal jurisdiction over Dwight Bennett. According to Perkins, his first contact with Dwight Bennett was in June 2011. Perkins acknowledges that he initiated that contact. Furthermore, it appears that Dwight Bennett, who worked in a different office than Larry Bennett, was unaware of the events relative to Perkins' Complaint until he was contacted by Perkins in June 2011. As such, the Court finds that subparagraph (9) does not confer personal jurisdiction over Dwight Bennett.

In sum, the Court concludes that Perkins has made a *prima facie* showing that Larry Bennett's conduct falls within the meaning of Ky. Rev. Stat. § 454.210(2)(a)(9). The Court thus finds that the first step of its inquiry is satisfied such that jurisdiction is proper over Larry Bennett and SCMA; however, because Dwight Bennett's conduct does not fall within any of the enumerated provisions of the Kentucky long-arm statute, the Court lacks personal jurisdiction over him. The Court now will proceed to analyze whether exercising jurisdiction over Larry Bennett and SCMA would violate due process rights.

### B. Due Process

"The Fourteenth Amendment's Due Process Clause sets the outer boundaries of a state tribunal's authority to proceed against a defendant." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2848 (2011). Due process "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp.*

*v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).  To satisfy due process, Perkins must "establish with reasonable particularity sufficient 'minimum contacts' with [Kentucky] so that the exercise of jurisdiction over [Defendants] would not offend 'traditional notions of fair play and substantial justice.'"  *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 889 (6th Cir. 2002) (quoting *Int'l Shoe*, 326 U.S. at 316).  The Sixth Circuit "has distilled the[] due process requirements into a three part test," each part of which must be met in order for a court to assert personal jurisdiction over an out-of-state defendant:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Neogen Corp.*, 282 F.3d at 889-90 (quoting *S. Mach. Co. v. Mohasco Indus., Inc.,* 401 F.2d 374, 381 (6th Cir. 1968)).

The "purposeful availment" prong is satisfied when a defendant's contacts with the forum state are such that he "should reasonably anticipate being haled into court there." *Rudzewicz*, 471 U.S. at 475. The defendant's contacts must be more than "random," "fortuitous," or "attenuated." *Id.*  Although Perkins does not assert breach of contract against Larry Bennett and SCMA, the personal-jurisdiction analysis that applies to interstate contracts is also applicable to the facts of this case.  When determining whether an interstate contract justifies the exercise of personal jurisdiction over a nonresident defendant, courts should examine the "prior negotiations and contemplated future consequences, along with the . . . parties' actual course of dealing" to determine

whether the "defendant purposefully established minimum contacts within the forum." *Id.* at 479. In this regard, the Sixth Circuit focuses on where the negotiation and performance occurred, advising that the quality of a party's contacts with the forum state matter more than the quantity. *Calphalon*, 228 F.3d at 722. But "jurisdiction will not lie solely because the out-of-state defendant has *some* business contacts with the forum state, particularly where the negotiation and performance of the agreement occurs largely out-of-state." *Papa John's Int'l, Inc. v. Entm't Marketing & Commc'ns Int'l, Ltd.*, 381 F. Supp. 2d 638, 643 (W.D. Ky. 2005) (emphasis in original) (citing *Calphalon*, 228 F.3d at 718; *Hillerich & Bradsby Co. v. Hall*, 147 F. Supp. 2d 672 (W.D. Ky. 2001)).

Perkins argues that the first prong is satisfied by the numerous emails and telephone calls "throughout the sixteen (16) months that [he] and Defendants were in contact." (Docket No. 6-1.) Perkins reasons that "[a]s a result of the telephone calls and emails, a contract was formed in Kentucky, payments were made to Defendants from Kentucky through wire transfer, and Movant Defendants derived substantial income from the Commonwealth of Kentucky." (Docket No. 6-1, at 19.) However, a careful reading of Perkins' argument and pleadings better illuminates several of the pertinent factual issues underlying Perkins' position. First, the Court accepts as true Perkins' statement that he exchanged scores of emails and telephone calls with Larry Bennett. However, of the more than 40 emails and 300 telephone calls exchanged, the majority of those communications appear to have been made or sent *by Perkins*. Perkins' Complaint specifically identifies only a handful of calls and emails sent by Larry Bennett, many of which were in response to communications from Perkins. In this regard, it appears to the Court that many of the Defendants' contacts with Kentucky are tied to Perkins' efforts to

contact Defendants, which "would not logically count as a contact of Defendants with the state." *Papa John's*, 381 F. Supp. 2d at 643. Second, the Court accepts as true Perkins' claim that he made a wire transfer to a South Carolina bank account at Larry Bennett's direction. However, Perkins does not allege that the wire transfer was made to Larry Bennett or SCMA, or to an account owned by either Larry Bennett or SCMA. Indeed, Perkins avers that the $150,000 was made as a loan to Marango and Mojave to secure financing and as a down payment on the ski resort. The obligation to repay Perkins the $150,000 was Marango's and/or Mojave's, not Larry Bennett's or SCMA's. Thus, the contract Perkins states "was formed in Kentucky" was between Perkins and Marango/Mojave, not Perkins and Larry Bennett/SCMA. The fact that the wire transfer was made through a Kentucky financial institution from an account belonging to a Kentucky resident is inapposite to the Court's analysis of whether the Defendants' actions created a substantial connection to Kentucky. Furthermore, it is unclear from Perkins' conclusory allegations what "substantial income" Larry Bennett and/or SCMA derived from Kentucky, as Perkins has produced no evidence of such income or revenue. *See id.* (citing *Auto Channel, Inc. v. Speedvision Network*, 995 F. Supp. 761, 765 (W.D. Ky. 1997)). The fact that Larry Bennett may have had a pecuniary interest in arranging the transaction does not necessarily equate to Larry Bennett and SCMA "deriving substantial revenue" from Kentucky.

Regardless, it is undisputed that all communications by Larry Bennett were made while Larry Bennett was in South Carolina. It also is undisputed that none of the properties (*i.e.*, the ski resort in North Carolina and the apartment complex in Maine) that were involved in Perkins' communications with Larry Bennett and that related to the

contract between Perkins and Marango/Mojave were located in Kentucky. There is no indication that Larry Bennett or SCMA intended to form an ongoing relationship with Perkins; indeed, Perkins' Response characterizes Larry Bennett as merely "act[ing] as a conduit between [Marango/Mojave] and [Perkins]." (Docket No. 6-1, at 11.)

Moreover, as noted above, SCMA is a nonresident corporation without an office, post office box, or phone listing in Kentucky. Larry Bennett never traveled to or visited Kentucky for business purposes relative to his dealings with Perkins, either before or after the Perkins' contracting with Marango/Mojave. All communications between Larry Bennett and Perkins took place via telephone or email. The Sixth Circuit has identified these sorts of communications "as precisely the sort of 'random,' 'fortuitous,' and 'attenuated' contacts that the [Supreme] Court rejected as a basis for haling non-resident defendants into foreign jurisdictions." *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1301 (6th Cir. 1989). Furthermore, the agreement that was finalized between Perkins and Marango/Mojave was a single agreement for a single loan. Thus, regardless whether the Mortgage Note created a continuing relationship between Perkins and Marango/Mojave, there existed no continuing relationship or obligations between either Perkins and Larry Bennett or Perkins and SCMA. Therefore, even accepting as true all of Perkins' factual allegations and construing the pleadings and affidavits in the light most favorable to him, the Court finds that Perkins has not carried his burden of showing that Larry Bennett's and SCMA's attenuated contacts with Kentucky satisfy the purposeful-availment prong such that they "should reasonably anticipate being haled into court there."[3]

---

[3] The same conclusion applies to Dwight Bennett, assuming the Court could exercise personal jurisdiction over him under the Kentucky long-arm statute.

Because the Court finds this first element of the three-part test lacking, the Court need not address the remaining two prongs. *See Calphalon*, 228 F.3d at 721-22; *LAK, Inc.*, 228 F.3d at 1300. But assuming the purposeful-availment element were satisfied, the Court is nonetheless convinced that Defendants' alleged actions or the consequences caused by them do not have a substantial enough connection with Kentucky to make the exercise of jurisdiction reasonable.

The third prong's reasonableness consideration asks whether the Court's exercising personal jurisdiction over Defendants would "comport with traditional notions of fair play and substantial justice." *CompuServe*, 89 F.3d at 1267-68 (citing *Reynolds*, 23 F.3d at 1117). The Sixth Circuit advises that "[a] court must consider several factors in this context, including 'the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies.'" *Id.* (quoting *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169-70 (6th Cir. 1988)).

First, the Court finds that Defendants will endure a substantial burden if forced to defend this action in Kentucky. Given their limited, attenuated contacts with Kentucky, the Court cannot conclude that they could have reasonably expected that the brokering of a loan between Perkins and Marango/Mojave would yield a lawsuit against them in Perkins' home state. Second, Kentucky has little interest in resolving this matter. While Perkins is a Kentucky resident, Larry Bennett is a South Carolina resident and SCMA is a South Carolina corporation. Furthermore, before SCMA stopping conducting business in July 2012, its business was focused in South Carolina, North Carolina, and Georgia. "While Kentucky has an interest in seeing that its citizens receive compensation for their

injuries, that interest will not carry the day where sufficient contacts with Kentucky are lacking." *Papa John's*, 381 F. Supp. 2d at 643. The Court recognizes that Perkins has an interest in obtaining relief; however, because most of his allegations involve activities and properties outside Kentucky, his interest in obtaining relief *in Kentucky* is minimal. Finally, South Carolina would appear to have the greater interest in resolving this matter. Larry Bennett is a South Carolina resident, and SCMA is a South Carolina-registered corporation. Most, if not all, of the tortious acts allegedly committed by Larry Bennett occurred in South Carolina. Accordingly, the Court concludes that the third prong of the due process analysis weighs against the exercise of personal jurisdiction in Kentucky.

## CONCLUSION

Therefore, having considered Defendants' Motion and being otherwise sufficiently advised, for the foregoing reasons;

**IT IS HEREBY ORDERED** that Defendants Larry Bennett, Dwight Bennett, and Advance Mortgage Source, Inc., d/b/a South Carolina Mortgage Associates' Motion to Dismiss for Lack of Personal Jurisdiction, (Docket No. 5), is GRANTED, and these Defendants shall be dismissed from this action.

**IT IS SO ORDERED.**

Date:

cc:      Counsel